WILLIAM WOODBURY *et al. vs.* SAMUEL G. BOWMAN.

Where öne, in contemplation of immediate death, deposited cash and notes indorsed by him to a surety, with the intention that the same should be received by the surety as soon as the death should be known, accompanied with written directions addressed to the surety, that he should from the proceeds relieve himself from his liabilities, and if any thing remained, give the balance to the children of the principal; and where the surety, after the death of the principal, received and claimed the property; *it was held,* that the surety might retain so much thereof as was necessary for his indemnity.

THIS case came before the Court on the following statement.

The parties agree to the following statement of facts, viz: On the fifteenth day of *September*, 1835, *Samuel Winter* of *Portland*, the plaintiffs' intestate, then doing a large commercial business, and owing amongst other debts, several notes and drafts, amounting to nine thousand five hundred dollars, on which said *Bowman* was liable as indorser or surety, and which he has since the death of said *Winter* been obliged to pay, and about five hundred dollars to said *Bowman*, went from *Portland* to *Bath*, put up his horse at the tavern, and went professedly to spend the night to the house of a Miss *Robb*, who, by direction of said *Winter*, had nearly a year before hired a house at *Bath*, in her own name, and there boarded and took charge of said *Winter's* daughters, he agreeing to pay all the expenses of her house-keeping. Early next morning, Miss *Robb* found that *Winter* had left the house, as he had proposed doing on the previous evening; and had left on the sofa, in her parlor, an apartment which *Winter*, when there, used as his sleeping room, a bundle tied up with his pocket-handkerchief. This was supposed to have been left by mistake, and was not opened until the morning after, *Sept.* 17th, when fears. being entertained by said *Bowman*, in consequence of a coat and hat being found in a boat, believed to have been *Winter's*, that some fatal accident had befallen him, Miss *Robb* delivered said bundle to said *Bowman*, and went with him to his house, near by, to have it opened and examined. It was then and there opened by said *Bowman*, in her presence, and found to contain a letter enclosing money and papers to Miss *Robb*; some linen clothing, about three dollars in loose change, said *Winter's* pocket-book, containing some papers of value, his watch, glasses, pencil-case, and penknife. Also a pack-

age folded in a newspaper with a letter on the outside, having the direction exposed to view, and fastened to it with twine wound around, and firmly binding together the letter and package. This letter was directed to

"*Col. Samuel G. Bowman,*

*Bath,*"

and above the direction, in paler ink, and in a smaller, tremulous hand, were written the words

"Be by yourself when this is opened."

The contents of the letter were as follows, viz.

"Keep the contents of this to yourself—'t is to relieve you from your liabilities for me. If any thing is left, let my children have it." *Sam'l Winter.*"

All being in said *Winter's* hand writing. Said package contained notes of several persons payable to said *Winter* or order, which have been paid to said *Bowman,* amounting to $2381,37; other similar notes not yet due, but believed to be good, amounting to $3605,15; others, supposed not good, of $283,00, all of which notes were indorsed on the back, in *Winter's* hand writing,

"Pay to the order of *Sam'l G. Bowman.*

*Sam'l Winter.*"

Also current bank-notes, amounting to $3977,00; also a bank check for $1000,00, with the word "Mem." thereon; but whether available or not is unknown.

The finding of the hat, and coat, and this bundle, with the fact that his horse and chaise had not been taken from the tavern, led the friends of *Winter* to suspect he was drowned. Search was then made for his body, which was found more than two days after, to wit, on the afternoon of the 19th of said *September,* drowned in the *Kennebec* river, at *Bath.*

It is further agreed by the parties, that the estate of said *Winter* is insolvent; that he drowned himself early on the morning of the sixteenth day of said *September*; and that said package and letter directed to said *Bowman,* were put into said bundle and left in Miss *Robb's* parlor, with the intention that they might be received by said *Bowman* as soon as might be after said *Winter's* death; and that the Court may infer from *these facts,* any *further facts* which a jury might reasonably infer therefrom.

If on these facts, the Court should be of opinion, that said *Bowman* has a legal right to retain said notes and securities, so far as may be necessary to indemnify him for his said liabilities for said *Winter*, an account shall be taken under the direction of the Court, of the amount of his said liabilities; and if there be no surplus, then the plaintiffs are to become nonsuit with costs for the defendants; otherwise the defendant is to be defaulted, and judgment to be rendered against him for such amount or balance as may be in his hands.

> *Mellen & Randall*, attorneys of defendant.
> *C. S. Daveis*, attorney of plaintiffs.

This case was argued in writing, and the arguments though showing great resources, were extended too much for publication, and were of a character which forbid abridgment.

*Daveis*, for the plaintiffs, commenced with this general position.

No doubt exists of the right of an insolvent debtor to prefer his creditor by an act executed and perfected in his lifetime. But the act must be such as to take effect before his death; otherwise the property or thing which was the subject of it, falls within the scope of the provisions for the equal distribution of the estates of deceased insolvents among their general creditors. Such act, it is contended, must be completed, and consummated by delivery and acceptance, or the subject at least placed in such a condition, as not to be revocable by the debtor at any possible moment of his existence. The retaining of such a power, morally or physically, would cause the attempt to fall within the legal principle of fraud. What would be the effect, if the death of the debtor should intervene, involuntarily, whether by accident or the course of ordinary mortality, after the property or thing assigned should have passed finally and irrevocably from the hand of the debtor, might present a different question from that which is now stated for the opinion of the Court; and might possibly, under some circumstances, be susceptible of a different solution. Death would dissolve any power to a third person for such purpose, that might have been granted, but which had not been executed. *Harper* v. *Little*, 2 *Greenl*. 18.

The general question raised by the agreed statement of facts, divesting it in the first place of the intentional character of *Winter's* death, is whether an insolvent, whose death may be expected as an

approaching event, or in near contemplation of it, can make a valid disposition of his property, or of more than a just proportion of it, for the purpose of paying a particular and favored creditor after his own death. It is truly and intrinsically an attempt to make *a testamentary disposition* of property contrary to the rules and principles of Common and Statute Law. Upon such a ground, it is plain it cannot be supported. It may more properly be called *a mortuary* disposition.

In the course of his argument, he cited *Meeker* v. *Wilson*, 1 *Gallison*, 422; *Carr* v. *Hoxie*, 5 *Mason*, 60; *Jewett* v. *Barnard*, 6 *Greenl.* 381; *Bradford* v. *Tappan*, 11 *Pick.* 76; *Buffington* v. *Curtis*, 15 *Mass. R.* 533; *Russell* v. *Woodward*, 10 *Pick.* 408; *Riggs* v. *Murray*, 1 *Johns. Ch. R.* 565; 5 *Toullier*, § 95, 192, 206, 208, 209; *Dupin's Pothier, vol.* 7, *p.* 446; *Tate* v. *Hilbert*, 2 *Ves. Jr.*, 112; *Ward* v. *Turner*, 2 *Ves.* 431; 2 *Kent's Com.* 444; *Bunn* v. *Markham*, 7 *Taunt.* 224; *Hooper* v. *Goodwin*, 1 *Swanst.* 486; *St.* 13 *Eliz. c.* 5; *Bayard* v. *Hoffman*, 4 *Johns. Ch. R.* 450; 2 *Kent*, 437; *Hunt* v. *Rousmanier*, 8 *Wheat.* 174.

*Mellen* and *Randall*, for the defendant, controverted the various positions taken by the counsel for the plaintiffs, and commented upon the authorities cited. At the close of the argument, they drew the following conclusions as proved by it:

1. The case finds, that the package and letter were put into the bundle, and left in Miss *Robb's* parlor, with the intention that they should be received by *Bowman*, as soon as might be after *Winter's* death.

2. The Court may at once infer that *Winter* intended this as a complete abandonment of his ownership and control of the property; it being all the delivery he could make in existing circumstances with safety.

3. That it was intended, that Miss *Robb*, or some one of the family, should carry or convey the articles to *Bowman*.

4. The package and letter were so conveyed, as soon as the death of *Winter* was known, just as he had intended.

5. Such a kind of delivery would have been sufficient, had it been a mortgage deed.

6. It was also sufficient, in case of an assignment of the securities in question.

7. That the death of *Winter*, in the circumstances of this case, made no difference, any more than the death of a vender of a vessel, who sold her while she was at sea, and died before she arrived in port and could reach the possession of the vendee.

8. And as the assignment was *bona fide*, and on a valuable consideration, and could never have been impeached by the creditors of *Winter*, if he were now living:

9. Therefore, his administrators cannot defeat it, had there been no delivery:

10. Because it was like a sale by a solvent man, which is always good, as between the vender and vendee, without any delivery.

In the course of the argument, they cited the following authorities. *Drury v. Smith*, 1 *Peere Wms.* 404; 3 *Atk.* 214; 2 *Kent*, 3d ed. 447, and note; *Lawson v. Lawson*, 1 *Peere Wms.* 440; *Miller v. Miller*, 3 *P. Wms.* 356; *Andrews v. Ludlow*, 5 *Pick.* 28; *Wheeler v. Sumner*, 4 *Mason*, 183; *Porter v. Cole*, 4 *Greenl.* 20; *Harrison v. Phillips Academy*, 12 *Mass. R.* 456; *Maynard v. Maynard*, 10 *Mass. R.* 456; *Wheelwright v. Wheelwright*, 2 *Mass. R.* 447; *Perkins, title, Deed,* § 143; 6 *Modern*, 217; *Verplank v. Sterry*, 12 *Johns.* 536; *Comyn, Fait*, A, 4; 4 *Day*, 66; *Ruggles v. Lawson*, 13 *Johns.* 285; *Chadwick v. Webber*, 3 *Greenl.* 141; 4 *Kent*, 455; *Bayley on Bills*, 227; *Shed v. Brett*, 1 *Pick.* 401; *Adams v. Lindsell*, 1 *P. & Ald.* 681; *Hanson v. Meyer*, 6 *East*, 614; *Aldridge v. Weems*, 1 *Gill & J.* 36; *Bholen v. Cleaveland*, 5 *Mason*, 174; *Marr v. Plumer*, 3 *Greenl.* 73; *Chitty's Pl.* 71; *Hatch v. Hatch*, 9 *Mass. R.* 307; *Witt v. Franklin*, 1 *Binney*, 502; *Ward v. Lewis*, 4 *Pick.* 521; *Halsey v. Whitney*, 4 *Mason*, 206; *Jewett v. Barnard*, 6 *Greenl.* 381; *Copeland v. Weld*, 8 *Greenl.* 414.

After advisement, the opinion of the Court was drawn up by

WESTON C. J.—*Winter*, although an insolvent man, had a legal right to give a preference to one creditor over another. In pursuance of this right, he indorsed certain negotiable instruments to the defendant. These, together with a bank check and certain bank notes which, being payable to bearer pass by delivery, he enclosed in a package, upon which there was fastened a letter directed to

Woodbury *v.* Bowman.

the defendant, advising him, that they were intended for security against certain liabilities, which he had assumed on his account.

Thus far the transaction, if consummated, could not have been impeached by other creditors. But there was another direction to pay over the surplus, if there was any, to his children, which his creditors may defeat. The defendant however was in no degree privy to this unlawful appropriation, and he expressly disclaims and repudiates this part of the arrangement. If the part, which was for his benefit, can surmount other objections, which have been interposed, we are of opinion, that he ought not to be prejudiced by the attempt of the deceased to create a trust for the benefit of his children.

It is contended, that *Winter* had a power of revocation, up to the period of his decease. No such power was reserved by him in the written evidence of the transaction, nor is there reason to infer that a revocation was at all within his contemplation. Before the desperate purpose, which he meditated, was carried into effect, it might fairly have been insisted, that it was possible he might have been diverted from it, either by the sounder suggestions of his own mind, or from adventitious causes; and that if this had been the result, he had the power, and would probably have exercised it, to have withdrawn the appropriation he had made for the defendant. Whether this can now be said to have been possible, is a metaphysical question, which we do not consider ourselves called upon to decide. The firmness of his resolve has been so fully demonstrated, that we regard it as a just inference, that the transaction was not only absolute and unqualified in form, but was intended to be so in fact, no possible or contingent revocation being contemplated.

A question of a graver character is, whether the arrangement was not arrested and defeated by the death of *Winter*. And it cannot but be admitted, that it is one of no small difficulty. It must however be decided; although the preponderance in favor of the prevailing party may be less strongly marked, than could have been desired. The determination of *Winter* to give a preference warranted by law to the defendant, has been clearly manifested. When he left Miss *Robb's* house, he intentionally parted with the actual possession of the bundle he had made up, never to be resumed. Had he called her up, and confided it expressly to her

care, she would have found that it contained a package, which she was to receive in trust for the defendant. Did he not do the same thing by acts, not to be misunderstood? He left the bundle in Miss *Robb's* house, in her possession, on her sofa. What was to be done with the package, was not communicated to her orally, but it was by the written direction upon it. Is it too much to say, that it was left with Miss *Robb* in trust, to be delivered according to its destination? It was not the less confided to her care, because she remained for some time ignorant of the deposit, or of its contents.

To give effect to a transaction lawful in itself, and free from any fraud imputable to the defendant, we do not regard it as too much to hold, that when *Winter* left the house, he parted with the possession of the contents of the package, in regard to which he had made a written declaration of trust, for a lawful purpose, in favor of the defendant, and that Miss *Robb* became thereupon actually or at least constructively, the trustee and depositary, through whose intervention the trust was to take effect; as we think the postmaster at *Bath* would have been, if *Winter* had put the package into his letter box; although it might not have come to his knowledge until life had been extinguished in *Winter*. *M'Kenney* v. *Rhodes*, 5 *Watts*, 343.

Much of the argument has turned upon the peculiar doctrine of donations, *inter vivos*, and *causa mortis*, to which, in our judgment, the case bears no just resemblance.

The counsel for the defendant places his claim to the property, sought to be recovered in this action, upon the ground of a contract or transfer, and that there was a delivery to Miss *Robb*, or to some one in her house, which would enure to the defendant's benefit. And cases have been cited, where deeds delivered as escrows, or upon condition, where the condition has been performed after the death of the grantor, have been held to take effect from the first delivery, to uphold and sustain what had been done. In these and other similar cases, although the concurrence of both parties may have been essential to their validity, the requisite act or concurrence of the grantee, even after the decease of the grantor, has been deemed sufficient. In *Bowers* v. *Hurd, Adm'r*, 10 *Mass. R.* 427, the plaintiff had a strong moral, although not strictly legal, claim

upon the defendant's intestate, to satisfy which the latter made a note of hand to the plaintiff, but without her privity or knowledge, until after the decease of the intestate, and deposited it with a third person. This was held to be good, upon the subsequent assent of the plaintiff.

Whether or not, upon the authority and analogies, deducible from the cases cited for the defendant, he is entitled to hold the property upon the ground of a contract; he may be so entitled, upon the trust expressly declared in his favor. It is a well settled doctrine in equity, that where a trust is created for the benefit of a third person, without his knowledge at the time, he may afterwards affirm it, and enforce its performance. *Neilson* v. *Blight*, 1 *Johns. Cases,* 205; *Moses* v. *Murgatroyd,* 1 *Johns. Ch. R.* 119; *Duke of Cumberland* v. *Codrington,* 3 *Johns. Ch. R.* 261; *Shepherd* v. *McEvers,* 4 *Johns. Ch. R.* 136. How then does the case stand? *Winter* in his lifetime, by writing under his hand, sets apart the property in question, and declares it appropriated for the indemnity of the defendant. He deposits it with Miss *Robb,* that it may be disposed of as directed, and then takes his own life. As soon as the fact comes to the knowledge of the defendant, he affirms the trust, and receives the property to be held for his indemnity, with the assent of the trustee and depositary.

We are not aware, that the circumstance of the business having been done by *Winter* in the near, or even certain approach of death, calls for a different construction. It has never been decided, that a man may not prefer one creditor to another, so long as he is competent to transact business, or that an act done for this purpose, by one who is conscious that his end is near, may be avoided as a fraud upon the laws for the distribution and settlement of insolvent estates. No case has come to our knowledge, in which the payment or security of an honest debt, has been attempted to be defeated upon this ground. If a preference under such circumstances is lawful, the intervention of death as a matter of certainty, or even of calculation, can make no difference. If an insolvent man, apparently in full health, and in the reasonable expectation of the continuance of life, deposits with a third person a sum in bank notes, or in bills of exchange or notes of hand indorsed by him, with written directions, that they be delivered as security to a cred-

itor, to whom he owes about an equal amount, and then happens to die, either from accident or disease, and the preferred creditor subsequently claims the deposit, we are aware of no legal reason why he may not receive it, for the purpose for which it was appropriated. It is not necessary in such case, as we have seen, that the act of the one, and the assent and concurrence of the other should be simultaneous. A deed of mortgage to secure a creditor, thus delivered, although accepted after the death of the mortgagor, it is clear from the authorities, would take effect.

The counsel for the plaintiffs has cited a class of cases, where an assignment is made by a debtor to third persons, for the benefit of his creditors, upon certain terms prescribed. This has been held not to be effectual against the attachment of creditors, so as to bind the property, except in favor of those who have assented; and this principally upon the ground, that a debtor shall not be permitted by conveying to others, to put his property out of the immediate reach of his creditors, without their consent. A conveyance or mortgage directly to a creditor as payment or security, is not liable to this objection. Even in an assignment to third persons, it has been strongly intimated by more than one Judge, that the consent of preferred creditors may be presumed, although the law is not so understood in this State or in *Massachusetts.* In the conveyance of real estate, the consent of the grantee is presumed, until he expresses his dissent or refusal. And it would seem, if there ever was a case, where the consent of a creditor might be presumed, it is where his debtor deposits a sum of money and available notes of hand, indorsed to him, and intended directly for his security.

If a man unable to pay all his debts, upon the eve of dissolution, and conscious of the fact, but yet capable of transacting business, delivers a deed, conveying land to one of his creditors in payment of his debt, to some one about his bed, it is good, although accepted after his decease. If he delivers his watch to a third person to be handed to a creditor for the same purpose, shall it not be equally effectual? Is there less difficulty in the transfer of real, than of personal estate? But it is contended that death prevented the transit, that the insolvent laws operated as an appropriation of all the property of the deceased for the use of all his creditors, and

that the transfer in this case was not consummated. The argument, sustained as it is by the equitable policy of the insolvent laws, is certainly entitled to great consideration, and we have felt its force. But it must be remembered, that the insolvent laws take effect, upon the death of the insolvent. While living, to the last moment, he has a right to dispose of his property, to pay or secure his debts. The deceased made a specific appropriation of a portion of his property, to secure the defendant, declaring in writing, that it was to be for this purpose, and left it with a third person for his use ; and upon the whole, we are of opinion, if the assent of the defendant is not to be presumed, that his subsequent affirmance does, by relation, give effect to the appropriation, in the lifetime of the deceased, so that the defendant may lawfully hold against the plaintiffs so much of the property, as is necessary for his indemnity.